[Cite as *In re C.G.*, 2017-Ohio-896.]


STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| C.G., DEPENDENT CHILD | ) | |
| | ) | CASE NO. 16 JE 0023 |
| | ) | |
| | ) | OPINION |


CHARACTER OF PROCEEDINGS:    Civil Appeal from Court of Common Pleas, Juvenile Division, of Jefferson County, Ohio
Case No. 2014 DN 00013

JUDGMENT:    Affirmed

APPEARANCES:
For Appellant    Attorney Eric Reszke
Suite 810, Sinclair Building
100 North 4th St.
Steubenville, Ohio 43952

Attorney Sara Gasser
2021 Sunset Blvd.
Steubenville, Ohio 43952

For Appellee    Attorney Amanda Abrams
JCJFS – Children Services Department
125 South 5th Street
Steubenville, Ohio 43952

JUDGES:

Hon. Gene Donofrio
Hon. Mary DeGenaro
Hon. Carol Ann Robb


Dated: March 13, 2017

DONOFRIO, J.

{¶1} Appellants, Brian and Candice G., appeal from a Jefferson County Juvenile Court judgment terminating their parental rights and granting permanent custody of their daughter to appellee, the Jefferson County Department of Job and Family Services.

{¶2} C.G. was born to appellant Candice G. (mother) and appellant Brian G. (father) on April 14, 2014. Appellee, the Jefferson County Department of Job and Family Services (the agency), was granted emergency temporary custody of C.G. when she was discharged from the hospital. C.G. was placed in a foster home.

{¶3} The trial court granted the agency emergency temporary custody based on the parents' history with their other children. The parents had recently moved to Ohio from West Virginia. According to the West Virginia Department of Protective Services (WVDPS), the parents had a history of abuse and neglect regarding C.G.'s five siblings. Mother had recently permanently relinquished her parental rights to her three other children. Father had recently permanently relinquished his parental rights to his three other children. The parents share one other child in addition to C.G. So together, the parents relinquished their rights to five children. Currently, two of the children are in the custody of WVDPS while the other three children are in the custody of their mother or father (who are different than the parents in this case).

{¶4} The parents' history with WVDPS dates back to 2008. According to WVDPS, there have been incidents of physical abuse by father, sexual abuse by father, and neglect allegations against mother for failing to adequately protect the children from abuse and for failing to report abuse of which she was aware.

{¶5} The trial court appointed a guardian ad litem for C.G. The court adjudicated C.G. a dependent child and granted the agency temporary custody. The agency put a case plan in place that included parenting classes, counseling, and supervised visitation for both parents. It also included sex offender specific treatment for father.

{¶6} On January 5, 2016, the parents filed motions to terminate the agency's temporary custody. A magistrate held a hearing on the motions.

**{¶7}** The magistrate elaborated on the allegations against the parents in West Virginia. He noted that WVDPS substantiated incidents where (1) father hit mother's child in the face causing a split lip and mark on her eye and mother failed to report this, (2) father duct-taped his child's head, and (3) father sexually abused mother's child and mother failed to report this. The magistrate then noted that C.G. had been in the agency's custody for almost two years and the parents had done everything the agency asked of them in their case plan including working with a parent aide, visiting C.G. on a regular basis, father undergoing sex abuse counseling, and mother completing counseling and continuing to attend voluntarily. The magistrate found that despite the parents' efforts, the agency had not structured a reunification plan. He noted that the parents visit with C.G. twice a week for two hours a visit. The magistrate pointed out this schedule had been the same for one and a half years.

**{¶8}** The magistrate also acknowledged testimony by an agency supervisor that the agency still had concerns regarding C.G.'s safety given that father never admitted to sexually abusing mother's child in West Virginia and mother failed to report the abuse. The magistrate noted that the agency was willing to increase visitation adding an additional day or additional hours. The agency stated that it had not done so sooner because it was short-staffed. Additionally, the magistrate noted that father's counselor classified father as a low to moderate risk of reoffending and recommended continued counseling.

**{¶9}** Based on the above, the magistrate recommended the trial court deny the motions to terminate temporary custody. He also recommended that the agency increase parenting time and "establish a meaningful path toward reunification while maintaining the child's safety." The trial court adopted the magistrate's decision on February 29, 2016.

**{¶10}** The next day, March 1, 2016, the agency filed a motion for permanent custody. In its motion, the agency stated that it did not receive the paperwork from WVDPS to substantiate the alleged sexual abuse until October 6, 2015. The agency

had "grave concerns" with father's continued denial of the sexual abuse.  It noted that there was one substantiated report of sexual abuse against father and three similar unsubstantiated reports.  The agency further stated that it recently increased visitation to three-hour visits and now allows mother to have unsupervised visits with C.G. at the agency.  In fact, the agency stated that mother is permitted as much unsupervised contact with C.G. at the agency that the foster parents can accommodate.

{¶11} On July, 25, 2016, the magistrate held a hearing on the agency's motion for permanent custody.  The magistrate heard testimony from the caseworkers, the guardian ad litem, the parents, and the paternal grandmother.  The magistrate found the parents had completed their case plans.  Nonetheless, the magistrate found that C.G. could not be safely placed with the parents within a reasonable period of time.  He also found that C.G. has been in the agency's custody for two years and has resided with the same foster family the entire time.  The magistrate then found that the serious nature or likelihood of abuse or neglect makes the placement of C.G. with her parents a threat to her safety.  The magistrate found that it was in C.G.'s best interest to grant her permanent custody to the agency.

{¶12} Both parents filed objections to the magistrate's decision.  They asserted the magistrate's decision was not in C.G.'s best interest.  They also argued that they completed all aspects of their case plans.  And they argued that the agency failed to make reasonable efforts to reunify them with C.G. and, in fact, never intended reunification.  Father also argued the agency failed to place C.G. with a suitable family member.

{¶13} The trial court overruled the parents' objections.  The court adopted the magistrate's decision and entered judgment granting the agency's motion for permanent custody.

{¶14} Mother and father each filed a timely notice of appeal on October 6, 2016.  Mother raises two assignments of error.  Father raises one assignment of error.  Father's assignment of error coincides with mother's second assignment.

Therefore, we will address them together.

{¶15} Mother's first assignment of error states:

THE JEFFERSON COUNTY JOB AND FAMILY SERVICES, CHILDREN SERVICES AGENCY DID NOT MAKE A REASONABLE EFFORT TO REUNIFY WITH THE NATURAL MOTHER OF THE MINOR CHILD.

{¶16} In this assignment of error, mother asserts the agency failed to make reasonable efforts to reunify her with C.G. Mother claims that she successfully complied with her case plan and there was nothing more the agency requested of her. She argues that although the agency created a case plan, their goal had always been to gain permanent custody of C.G. She points out that she attended counseling sessions, visitations, and parenting classes. Mother also points out that her visitation was increased from one-hour visits to two-hour visits. But when she asked for another increase in visitation, the agency refused due to staffing problems. She asserts the agency should have continued to increase her visitation until she could be reunified with C.G.

{¶17} Although father does not raise reunification efforts as a separate assignment of error, he still makes an argument similar to mother's argument here. Father asserts the agency thwarted his efforts to reunify with C.G. He points out the agency denied requests for additional visitation, failed to reschedule canceled visits, would not allow him to hold C.G., and denied his request to go to doctors' visits with C.G.

{¶18} If a child has been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period, the agency shall file a motion requesting permanent custody of the child. R.C. 2151.413(D)(1).

{¶19} The agency must make reasonable efforts to reunify the family before terminating parental rights. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 4. If it has not already proven reasonable efforts, the agency must do

so at the permanent custody hearing. *Id.*

{¶20} Courts have described "reasonable efforts" as the agency's efforts to resolve a threat to a child's health or safety before removing the child from his or her home or permitting the child to return home again, following an intervention to protect the child from abuse or neglect. *In re H.H.*, 9th Dist. No. 25463, 2010-Ohio-5992, ¶ 10.

{¶21} In this case, the evidence demonstrates that the agency made reasonable efforts to return C.G. to her parents' care.

{¶22} Nicole Cook, the agency caseworker assigned to this case, testified regarding the case plan for the family. She stated that the agency formulated a case plan for the parents that included working with a parent aide, attending visitation, and attending individual and couples' counseling. (Tr. 153). Cook stated that father was also to attend a sexual offender treatment assessment and follow all recommendations that followed the assessment. (Tr. 153). She stated that the agency provided father with the names of a few different sex offender treatment professionals and father then selected Dr. Kissinger. (Tr. 156).

{¶23} Cook also testified that the agency received some information from WVDPS at the beginning of this case but WVDPS did not send the agency its complete file. (Tr. 153). She stated WVDPS had told the agency by phone that there was a substantiated claim of sexual abuse by father but WVDPS did not provide them with the paperwork to support this statement. (Tr. 153). Consequently, Cook made multiple calls to the WVDPS supervisor. (Tr. 153). Cook also had Dr. Kissinger make several phone calls to WVDPS in an attempt to obtain the entire file. (Tr. 153). She finally received the file in October 2015. (Tr. 154). Cook immediately scheduled a family team meeting to go over the file. (Tr. 154). Cook stated the agency then filed for an extension of temporary custody in order to give Dr. Kissinger time to address the issues substantiated by the file. (Tr. 154-155).

{¶24} Cook stated that throughout this case she remained in contact with Dr. Kissinger regarding father's progress and received approximately six reports from

him. (Tr. 156-158). As to the parents' progress on the case plan, Cook testified that they completed individual and couples' counseling. (Tr. 160). She stated the agency received letters from both of their counselors stating they had completed their counseling. (Tr. 160).

**{¶25}** Linda Battle, the parents' case aide, also testified regarding the agency's efforts in this case. Battle provided parenting classes to the parents and also supervised their visitations. (Tr. 213). As to the parenting classes, Battle stated the classes began when C.G. was an infant and occurred right after visitations. (Tr. 213-214). The weekly classes continued for eight to nine months. (Tr. 214-215). Battle testified that the parents were receptive to what she taught them. (Tr. 215). As to the visitation, Battle stated that the supervised visits started out at two, two-hour visits per week. (Tr. 215). She stated the agency later increased the supervised visits to two, three-hour visits per week. (Tr. 216). She also stated that recently mother was given two more hours per week of unsupervised visitation without father. (Tr. 216).

**{¶26}** Given Cook's and Battle's testimony and the history of this case, the agency demonstrated reasonable efforts to return C.G. to her parents' care.

**{¶27}** Accordingly, Mother's first assignment of error is without merit and is overruled.

**{¶28}** Mother's second assignment of error states:

THE MAGISTRATE'S DECISION AND THE JUVENILE COURT'S AFFIRMATION OF SAID DECISION, WHICH TERMINATED THE PARENTAL RIGHTS OF THE APPELLANT, WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶29}** Father's sole assignment of error states:

THE JUVENILE COURT COMMITTED REVERSIBLE ERROR

IN GRANTING THE AGENCY'S MOTION FOR PERMANENT CUSTODY.

{¶30} In this assignment of error, mother takes issue with two of the trial court's conclusions.

{¶31} First, she takes issue with the trial court's conclusion that C.G. was doing well in foster care. Mother asserts there was undisputed testimony that, during the winter, the foster parents brought C.G. to visitation without a coat, hat, shoes, or socks. She also states there was testimony that C.G. was often dirty with matted hair. And mother points to testimony that at visits, she would clean C.G.'s face, comb her hair, and bring her appropriate clothing.

{¶32} Second, mother takes issue with the trial court's finding that it was in C.G.'s best interest to terminate parental rights and grant permanent custody to the agency. She argues the agency did not prove by clear and convincing evidence that any of the factors in R.C. 2151.414(E) necessary for permanent custody applied here. Again mother argues that the agency did not use reasonable efforts to reunify her with C.G. and that she complied with her case plan. She also asserts there is no evidence of alcohol or drug use and no housing concerns. Mother asserts the evidence was that she has completed her case plan and can provide a safe home for C.G.

{¶33} In his assignment of error, father also argues that he completed his case plan. He asserts the evidence was that he successfully completed parenting classes, counseling, an assessment and sex offender specific treatment, and visitation. Father also points to evidence that he consistently visits C.G., buys her clothing, and is concerned with her well-being. Father additionally notes that he has denied the abuse allegations against him.

{¶34} A parent's right to raise his or her children is an essential and basic civil right. *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "Permanent termination of parental rights has been described as 'the family law equivalent of the

death penalty in a criminal case.' *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45, 54." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). However, this right is not absolute. *In re Sims*, 7th Dist. No. 02-JE-2, 2002-Ohio-3458, ¶ 23. In order to protect a child's welfare, the state may terminate parents' rights as a last resort. *Id.*

**{¶35}** We review a trial court's decision terminating parental rights and responsibilities for an abuse of discretion. *Sims*, 7th Dist. No. 02-JE-2, ¶ 36. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶36}** Pursuant to R.C. 2151.414(B)(1):

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *.

**{¶37}** Clear and convincing evidence is evidence that produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

**{¶38}** In this case, the trial court found, and it is undisputed that, C.G. has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. C.G. has been in the agency's continuous custody since she was discharged from the hospital at birth in April 2014. Therefore, R.C. 2151.414(B)(1)(d)

applies here. Thus, we must determine whether clear and convincing evidence supports the trial court's determination that it was in C.G.'s best interest to grant her permanent custody to the agency.

{¶39} In determining whether it is in the child's best interest to grant custody to the agency, the court shall consider:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, * * * with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child [regarding certain crimes, withholding food or medical treatment, drug and alcohol abuse, abandonment, and having previously had parental rights terminated].

R.C. 2151.414(D)(1).

{¶40} The trial court made several pages of detailed findings, including the following findings regarding the statutory best interest factors.

{¶41} As to the first statutory factor (the child's interaction with parents, foster parents', siblings, etc.), the court found C.G. has bonded with her foster family and is doing very well there. It noted that she has been successfully integrated into her foster home and her foster parents are interested in adopting her.

**{¶42}** As to the second statutory factor (the child's wishes), the court found that C.G. was too immature based on her age (two years old) to express her wishes.

**{¶43}** As to the third statutory factor (the custodial history), the court found that the agency received custody of C.G. when she was discharged from the hospital after her birth. C.G. was immediately placed in foster care. She has remained in the same foster home throughout the duration of this case. C.G. has been in the agency's custody for 12 or more months of a consecutive 22-month period.

**{¶44}** As to the fourth statutory factor (the child's need for a legally secure permanent placement), the court found C.G. cannot be safely placed with the parents within a reasonable period of time. It further found C.G. is in need of a legally secure permanent placement and such a placement cannot be accomplished without the granting of permanent custody to the agency.

**{¶45}** The fifth statutory factor (dealing with certain convictions and other issues) does not apply in this case.

**{¶46}** In addition to the statutory factors, the court made many other findings as follows.

**{¶47}** The GAL recommended the court grant the permanent custody motion. C.G. is healthy and has no medical issues.

**{¶48}** Shortly before C.G.'s birth, the parents relinquished their respective rights to four children in West Virginia. Father had previously relinquished his rights to another child. After relinquishing their rights, the parents moved to Ohio, in part to attempt to maintain custody of C.G.

**{¶49}** Father has substantiated sexual abuse claims against him in West Virginia. Father also has unsubstantiated sexual abuse allegations against him in West Virginia. And father has substantiated physical abuse claims against him in West Virginia. Mother has substantiated failure to protect claims against her in West Virginia. The parents remained silent in the court proceedings in West Virginia where they were found to be abusive and neglectful parents. In West Virginia, a person's silence when confronted with probative evidence against them is considered

affirmative evidence of the person's culpability.

**{¶50}** The agency established a case plan with the initial goal of reunification. The parents completed the case plan as far as education and aide services, individual counseling, couples' counseling, and visitation. Father also completed a sex offender assessment and sex offender treatment which was then added as part of the case plan. Father underwent sex offender treatment with Dr. Kissinger. Dr. Kissinger classified father as a low to moderate risk to reoffend due to father's denial of sexually abusing any of the children in West Virginia.

**{¶51}** Mother completed her case plan. But there is still a concern surrounding mother's ability to protect C.G. due to her failure to report in West Virginia. Mother knew father struck one of the other children in the face but failed to report it. Mother does not believe the sexual abuse allegations against father. Father continues to deny committing any sexual abuse. Father initially admitted to duct-taping of the children's heads, but now denied this incident.

**{¶52}** The evidence supports the trial court's findings.

**{¶53}** In addition to the testimony set out above in addressing mother's first assignment of error, the parties presented the following evidence.

**{¶54}** Dr. Kissinger first met with father in June 2014. (Tr. 10). He conducted several tests and at that time concluded that father was at low risk to sexually reoffend. (Tr. 12). At that time, Dr. Kissinger did not have knowledge of any substantiated claims against father. (Tr. 13). Father admitted to hitting a child in the car but claimed it was in an attempt to keep the child in the car seat. (Tr. 14). Dr. Kissinger counseled father to work on parenting issues and stress. (Tr. 13).

**{¶55}** In April 2015, Dr. Kissinger was provided information regarding allegations that father had punched his adopted son in the groin and touched his genitals. (Tr. 15). Consequently, Dr. Kissinger recommended father attend sexual offender specific treatment. (Tr. 16). Father complied with this recommendation. (Tr. 16). Dr. Kissinger also recommended father should have increased time with C.G. (Tr. 39).

**{¶56}** In October 2015, Dr. Kissinger received written documentation that the physical and sexual abuse regarding father's adopted son was substantiated. (Tr. 18). Dr. Kissinger addressed this matter with father. (Tr. 19). Father denied the abuse. (Tr. 19). Based on the information that the allegations were substantiated, Dr. Kissinger recommended that father continue with sex offender treatment. (Tr. 19).

**{¶57}** In January 2016, Dr. Kissinger re-evaluated father. (Tr. 20). He determined father was now at a low to moderate risk to sexually reoffend. (Tr. 20). In other words, Dr. Kissinger stated father had a 30 to 40 percent likelihood of reoffending. (Tr. 37). Dr. Kissinger stated that father's risk level was elevated because he continued to deny the sexual abuse. (Tr. 20). In other words, Dr. Kissinger believed there was a possibility that father would reoffend. (Tr. 20-21). Nonetheless, Dr. Kissinger opined that if father was left alone with C.G., she would be safe. (Tr. 40). He recommended father have continued therapy sessions and have continued contact with C.G. (Tr. 23).

**{¶58}** Finally in July 2016, Dr. Kissinger opined at the hearing that if father was going to reunify with C.G., he should continue with sex offender treatment. (Tr. 25). But Dr. Kissinger also opined that father had reached the maximum benefit from his treatment because he continued to deny he committed any sexual abuse. (Tr. 25).

**{¶59}** Anna Grafton was the family's caseworker in West Virginia. Grafton was assigned to the case in May 2013. (Tr. 61). She explained the case history and that the family's case was open and shut several times in West Virginia.

**{¶60}** Grafton testified that one of father's biological children, who was two years old at the time, had genital warts and she had reported that father had licked her private area. (Tr. 62). The allegation was unsubstantiated, however, because the child could not give many details. (Tr. 63). Father, however, later tested positive for genital warts as well. (Tr. 90). Several other individuals who were in frequent contact with the child tested negative. (Tr. 91).

{¶61} Grafton next testified that in 2008 or 2009, one of mother's children, who was three or four years old at the time, reported to her biological father that father had licked her private area. (Tr. 63-65, 68). That allegation was unsubstantiated. A few years later, the same child reported that father hit her in the face while they were in the car. (Tr. 65). The child suffered a split lip and abrasions to her face. (Tr. 65). The child reported the incident to mother, but mother failed to report it. (Tr. 65). WVDPS substantiated that father physically abused the child and that mother failed to do anything about it. (Tr. 66). The children were placed with their paternal grandmother at that time. (Tr. 68). But they were removed after another allegation arose. (Tr. 69).

{¶62} As a result of striking the child in the car, father was charged with battery. (Tr. 73). The charge was dismissed, however, after father completed a domestic violence program. (Tr. 73).

{¶63} Grafton testified that mother and father's biological child disclosed to her grandmother that father had touched her private area. (Tr. 69). WVDPS substantiated this allegation. (Tr. 69).

{¶64} Next, Grafton testified regarding an allegation by father's adopted son that father had "duct-taped" him. (Tr. 72). Grafton stated that father admitted to this allegation. (Tr. 72). Thus, WVDPS substantiated this claim of physical abuse. (Tr. 72).

{¶65} Finally, Grafton testified as to an allegation by father's adopted son that father had on occasion grabbed his private area. (Tr. 79-81). The son disclosed this information to his grandmother who reported it to WVDPS. (Tr. 79-81). WVDPS substantiated the claim after the child spoke with someone at the sexual assault help center. (Tr. 81).

{¶66} As to the claims that were substantiated, Grafton testified that in order to be substantiated, the burden of proof in West Virginia was preponderance of the evidence. (Tr. 123). She also stated that the parents' silence in court on these allegations was construed as an admission on their part. (Tr. 132).

**{¶67}** Grafton also testified that WVDPS implemented an improvement plan for the family and provided them with numerous services such as a domestic violence program, parenting services, and life skills services. (Tr. 72-77). Grafton testified, however, that the parents were unable to make the satisfactory changes with regard to the improvement plan. (Tr. 79). WVDPS had a continuing concern that mother refused to believe that father was abusing the children and that she would fail to report abuse in the future. (Tr. 74-75)

**{¶68}** As a result of all of the above, Grafton testified that the parents voluntarily surrendered their rights to all of their children. (Tr. 91). At the time, mother was pregnant with C.G. (Tr. 92).

**{¶69}** Michelle Kuczynski is the agency intake worker who handled this case. She testified that based on the parents' case in West Virginia, the agency moved the trial court for an emergency custody order of C.G., which the court granted. (Tr. 138).

**{¶70}** Caseworker Nicole Cook testified as to the parents' case plan as discussed above. Cook testified that the parents completed all aspects of the case plan except for one. (Tr. 158). The one aspect they did not complete was that the agency still has "very much concern" regarding the sexual abuse. (Tr. 158). Cook was concerned that father continued to deny committing any sexual abuse. (Tr. 158). She stated that father could not work through the sex offender treatment program when he did not admit to committing any sexual abuse. (Tr. 158-159). She also noted that the child who tested positive for genital warts was two years old at the time. (Tr. 170). She stated that C.G. was now two, and that concerned her. (Tr. 170).

**{¶71}** Cook next testified that in February 2016, mother contacted her and stated she had filed for divorce from father so that she could get custody of C.G. (Tr. 170-171). But mother withdrew her complaint for divorce shortly thereafter. (Tr. 175). Cook testified that the agency's main concern with mother is that she is married to father. (Tr. 195).

**{¶72}** Next, Cook testified that C.G. has been with the same foster parents since her birth. (Tr. 180-181). She stated C.G. is thriving and has no developmental delays. (Tr. 181). Cook stated C.G. is attached to her foster parents and they have expressed a desire to adopt her. (Tr. 181).

**{¶73}** Case aide Linda Battle testified regarding the parents' visitation and parenting classes as discussed above. Battle testified that the duration of the supervised visits increased over time. (Tr. 215-217). In fact, mother is now permitted unsupervised visitation at the agency as long as she can arrange it with the foster parents and as long as father does not attend. (Tr. 217). Battle testified that at one point the parents asked to attend C.G.'s doctor visits, but the agency did not allow them. (Tr. 226-227).

**{¶74}** As to the foster parents, Battle stated that mother expressed some concern when they brought C.G. to visits wrapped in a blanket instead wearing of a coat and socks. (Tr. 229). She also stated the parents had concerns when the foster parents brought C.G. to visits being "a little dirty." (Tr. 230). Battle stated this was addressed with the foster parents. (Tr. 230). She stated that the foster parents also cancelled visits occasionally due to doctor's appointments or car troubles. (Tr. 232-233). Sometimes the visits were made up and other times they were not. (Tr. 233).

**{¶75}** Battle stated the parents have always attended their visits and been cooperative with the rules. (Tr. 222). She testified that at visits, mother combs C.G.'s hair and brings her new clothing. (Tr. 232).

**{¶76}** Margaret is C.G.'s paternal grandmother. She testified that she petitioned the court for custody of C.G. but the court denied her petition. (Tr. 245-246).

**{¶77}** Father testified that he was honest and forthcoming with Dr. Kissinger. (Tr. 281). He believed that he completed Dr. Kissinger's program. (Tr. 281). Father further denied all of the allegations against him except for one. (Tr. 282-288, 296). Father admitted to striking the child in the car. (Tr. 285). He stated he was trying to push her back in her seat and "caught her in the face." (Tr. 285). Father stated he

was charged with domestic battery but the charge was dropped after he completed anger management classes. (Tr. 285-286).

**{¶78}** Father testified he gave up his rights to his children "just to stop everything." (Tr. 288). He stated he was tired of the allegations and of putting his children through this situation. (Tr. 288). He also stated that his lawyer in West Virginia advised him and mother to voluntarily surrender their rights and then to move out of West Virginia to have C.G. in hopes to keep her. (Tr. 304).

**{¶79}** Mother testified that she knew father hit the child in the car and she did not report it. (Tr. 310). She denied that any of the other children reported any abuse to her by father. (Tr. 313). Mother testified the agency gave her a case plan and she completed it. (Tr. 314-315).

**{¶80}** She also testified as to her concerns with the foster parents. Mother stated that sometimes in the winter C.G. would not have on a hat, coat, socks, or shoes. (Tr. 321). She has come to some visits dirty and her hair has not been washed. (Tr. 321). Mother stated that when C.G. comes to visits, she cleans her up, does her hair, and changes her clothes. (Tr. 321).

**{¶81}** And mother stated that she filed for divorce in an attempt to keep C.G. (Tr. 324). But she later dismissed the divorce action because she believed she would fail. (Tr. 325).

**{¶82}** Finally, mother testified that her lawyer advised her not to testify in the West Virginia court proceedings. (Tr. 326). But her lawyer did not advise her that by not testifying, she was admitting the allegations against her. (Tr. 326).

**{¶83}** This is a difficult case because the parents complied with most of their case plan. They successfully completed parenting classes, they completed individual and couples' counseling, and they regularly attended visits with C.G. There were no complaints from the agency workers regarding any of these areas of the case plan.

**{¶84}** But the problem remains that father has not, to the agency's satisfaction, addressed the sexual abuse allegations against him. In fact, father has steadfastly denied these allegations. Likewise, mother has failed to acknowledge

that father has done anything wrong. Dr. Kissinger testified that father regularly attended sex abuse offender treatment. But the doctor opined that until father can admit what he did, father has reached the maximum benefit from treatment. Dr. Kissinger opined that father had a 30 to 40 percent chance of reoffending. Multiple allegations were made against father by multiple children, both his and mother's children, of sexual and physical abuse. WVDPS was able to substantiate two allegations of physical abuse and one allegation of sexual abuse. Moreover, even though WVPDS was unable to substantiate the claim of abuse, father's two-year-old was diagnosed with genital warts and father too was diagnosed with genital warts.

**{¶85}** Given the severe nature of the allegations, the fact that several of the allegations were substantiated, and the fact that both father and mother continue to deny the allegations, despite the parents' compliance with the rest of the case plan, the trial court did not abuse its discretion in granting permanent custody to the agency.

**{¶86}** Several courts have commented on similar situations where the parents substantially complied with the case plan, yet the court still granted the motion for permanent custody.

**{¶87}** For instance the Third District noted, "[s]ubstantial compliance with a case plan, without more, does not entitle a parent to custody." *In re Gomer*, 3d Dist. Nos. 16-03-19, 16-03-20, 16-03-21, 2004-Ohio-1723, ¶ 36. Courts instead are to consider whether the parent has substantially remedied the conditions that caused the child's removal. *Id.*

**{¶88}** The Eighth District similarly held, "a parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself." *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). Substantial compliance with a case plan does not preclude a grant of permanent custody to a social services agency. *Id.*

**{¶89}** And the Fourth District has stated:

"* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm." *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987), quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343, 346 (1972).

Thus, the trial court had no obligation to experiment with this young child's welfare in order to permit appellant to prove that he would be able to properly care for the child, protect the child from potential harm that could result from the mother's mental illness, and provide a safe, stable, and permanent home, especially when the child had been in the same foster home since birth and when appellant had over one year to prove his suitability. The trial court quite reasonably could have determined that uprooting the child from the only home he has ever known and placing him in appellant's uncertain care would not be in the child's best interest.

*In re W.C.J.*, 4th Dist. No. 14CA3, 2014-Ohio-5841, ¶ 48.

{¶90} Such is the case here. C.G. has lived with her foster parents since her birth. They are the only family she has ever known. There may have been some minor issues with the foster parents not combing C.G.'s hair or bringing her to visits with a blanket instead of a coat and hat. But other than those minor issues, the testimony was that C.G. is attached to her foster parents and doing very well. And the foster parents wish to adopt her. The trial court should not be required to gamble with C.G.'s well-being by placing her in mother and father's uncertain care. Again, the focus in this case is C.G.'s best interest, not the parents' compliance with their

case plan.

**{¶91}** The evidence was clear that C.G. has been in the agency's care for at least 12 of the past 22 months. The evidence also established that mother and father have not been able to substantially remedy the condition that caused the agency to remove C.G. from their care. And the evidence demonstrated that permanent custody was in C.G.'s best interest. For these reasons, the trial court did not abuse its discretion in granting the agency's motion for permanent custody.

**{¶92}** Father also raises an argument that the court should have granted C.G.'s custody to his mother who filed a petition for legal custody of C.G.

**{¶93}** The paternal grandmother filed a petition for allocation of parental rights and responsibilities with the trial court in a separate case. The magistrate recommended denying the grandmother's petition. No objections were filed to the magistrate's decision. The trial court adopted the magistrate's decision and denied the grandmother's petition for allocation of parental rights and responsibilities. No appeal was filed from the trial court's judgment. Thus, the time to make an argument regarding placement with the grandmother has passed.

**{¶94}** Accordingly, mother's second assignment of error is without merit and is overruled. Likewise, father's sole assignment of error is without merit and is overruled.

{¶95} For the reasons stated above, the trial court's judgment is hereby affirmed.

DeGenaro, J., concurs.

Robb, P.J., concurs.